**UNITED STATES of America, Appellee,**

v.

**Antonino AIELLO,
Defendant–Appellant.**

**No. 98, Docket 88–1113.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 29, 1988.

Decided Dec. 23, 1988.

Martin G. Weinberg, Boston, Mass. (Lillian A. Wilmore, Oteri, Weinberg & Lawson, Boston, Mass., Kimberly Homan, Zalkind, Sheketoff, Homan, Rodriguez & Lunt, Boston, Mass., of counsel), for defendant-appellant.

Andrew C. McCarthy, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City, Kerri L. Martin, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES, MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Antonino Aiello ("Tony" or "Aiello") was convicted, after a jury trial, of conspiring to distribute and possess with intent to distribute heroin and cocaine, in violation of 21 U.S.C. § 846 (1982) (Count 1); distributing and possessing with intent to distribute heroin and cocaine, in violation of 21 U.S.C. §§ 812 (1982 & Supp. III 1985), 841(a)(1) & (b)(1)(A) (1982 & Supp. III 1985) and 18 U.S.C. § 2 (1982) (Counts 2–9, 12); and operating a continuing criminal enterprise ("CCE") for the distribution of narcotics, in violation of 21 U.S.C. § 848 (1982 & Supp. IV 1986) (Count 15).

Aiello appeals from all counts except Counts 1 and 6 of his judgment of conviction. He challenges the sufficiency of the evidence as to the distribution and possession counts and the CCE count. We reject his contention and hold that an aiding and abetting offense may serve as a predicate for the continuing criminal enterprise statute, so long as the aider and abettor is a "kingpin." Aiello also challenges: the district court's instruction that, for purposes of the "continuing series" element of the CCE statute, the jury could consider any violation of the narcotics laws, even a violation not charged in the indictment; the admission into evidence of an undercover agent's interpretation of a co-conspirator's statement; and the severity of his sentence. These remaining contentions also are rejected and the judgment of the district court is affirmed.

## BACKGROUND

Because Aiello challenges the sufficiency of the evidence, it is necessary to recount the facts at some length. In October 1977, Aiello opened a pizzeria ("Tony's Pizza" or "Tony's") at 164 West 125th Street in Harlem where, over the course of seven years, he ran a heroin and cocaine distribution network. In early 1978, Lawrence "Big Al" Robinson, a street-level dealer who eventually cooperated with and testified for the government, met Aiello at the pizzeria. Robinson was told by the assistant manager that if Robinson needed drugs to sell, Aiello could provide "top-notch drugs." Aiello thereafter made Robinson a sales agent. For five years, Robinson brought drug customers to Aiello's restaurant in exchange for a percentage of the sales made to those customers.

At times, Aiello was involved personally in the drug dealings. On at least one occasion, at the urging of Robinson, he met with an aggrieved buyer to settle a dispute. However, he generally left the day-to-day operation to others. In 1978, Rosetta Palmer was hired, ostensibly as a waitress and cook, but in reality to facilitate drug transactions. Giuseppe Giusto, known as "Joey," soon became Aiello's lieutenant, and ran the drug business at the restaurant. Robinson testified that Aiello's brother-in-law, Filippo Gambina, accompanied Giusto each day to Tony's Pizza and assisted Giusto in the distribution of cocaine and heroin from the rear kitchen area of the pizzeria. He also testified that he once received a package of heroin from Giusto and Dominick DiGangi, who also worked for Aiello and delivered heroin with Giusto. There also was evidence that, at least in the later stages of the enterprise, Aiello's father, Vito, and sister, Jane, engaged in various drug-related activities for the distribution network.

On June 30, 1983, Robinson was arrested for selling one-quarter ounce of heroin. He thereafter cooperated with the New York Drug Enforcement Task Force by providing information about Aiello's drug enterprise and by assisting an undercover agent, Detective Richard Ford, in purchasing drugs from the enterprise.

On July 21, 1983, Ford purchased an ounce of heroin from Palmer at the pizzeria (Count 2). According to Ford, Palmer nodded to the kitchen area, referred to "another customer" and stated, "[m]y people are back there now." Approximately ten minutes after Ford left, Giusto and DiGangi were seen leaving Tony's.

Ford returned to the pizzeria on August 16, 1983 and again sought to purchase one ounce of heroin. Palmer stated, "He only left half of what you got before. Do you want it?" Ford purchased the one-half ounce (Count 3).

On August 18, 1983, Palmer introduced Ford to Giusto and Gambina when Ford bought an ounce of heroin at Tony's. Although Ford did not have enough money for the ounce, Giusto allowed Palmer to give him the entire ounce for partial payment, with the understanding that Ford would pay the remainder later (Count 4).

Upon his return to the pizzeria on October 13th, Ford argued with Giusto about the quality of his last purchase and agreed to buy yet another ounce of heroin. (He also paid Giusto the money that he owed from the August 18th transaction.) Because Giusto had "another customer waiting outside," however, Ford had to come back later that day to pick up his ounce from Palmer (Count 5).

On December 14, 1983, Ford called Palmer at the pizzeria to obtain the telephone number for Aiello's cafe in Queens ("Caffe Aiello") so that he could call Giusto about purchasing one-eighth kilogram of heroin. Palmer had the number but informed Ford that Giusto made it clear that the cafe was not to be called under any circumstances. Ford went to the pizzeria, whereupon Giusto called and told Ford to leave the money there with Palmer. Ford instead waited for Giusto to arrive. At approximately 5:00 p.m., Giusto appeared in a car with Aiello. After speaking briefly with Ford, Giusto instructed Raymond Boyd, a longtime worker at the pizzeria, as follows: "Go across the street. Tony [Aiello] is in the car. Get the package...." Boyd did

so and, once inside the restaurant, handed the package to Giusto, who in turn passed it on to Ford in exchange for $30,000 (Count 6). Aiello does not appeal his conviction on Count 6.

On the morning of March 6, 1984, Aiello and Giusto met in Caffe Aiello for approximately one hour. That evening, Ford contacted Giusto about purchasing another one-eighth kilogram of heroin, and the two agreed to meet at the pizzeria. Giusto rode with Gambina to Vito Aiello's home, where he picked up a brown paper bag, and then went to Tony's Pizza. At the pizzeria, Ford overheard Giusto tell Palmer, "Phillip [Gambina] is in the car holding the bag." They sent Boyd out to the car to get the bag; Gambina returned with Boyd to the restaurant. Gambina gave the package to Giusto, who then gave it to Palmer with instructions to go to the basement and to take from it an eighth of a kilogram for Ford. Ford then paid Giusto $30,000 for the heroin (Count 7). After Ford left the pizzeria, Giusto and Gambina drove directly to Caffe Aiello, which they entered after securing the money in their car trunk.

On May 9, 1984, Ford went to the cafe and attempted, unsuccessfully, to deal directly with Aiello. Ford first asked for Gambina, but was told he was out and would be back shortly. Minutes after Ford left, Aiello and Gambina milled about and peered through the glass front doors, looking up and down the street. Later, Ford drove back to the cafe. As Ford began to park, Aiello looked in Ford's direction and spoke into the ear of Gambina, who was seated with him at a table near a window. Immediately, Gambina rose, exited the cafe and walked toward Ford, while looking back at Aiello. Ford requested to buy heroin, but Gambina responded, "Can't do it now. The police are on the street." The events at the cafe that day were videotaped and played for the jury.

Giusto spoke by telephone with Ford, who was at Tony's Pizza, on May 15, 1984. Giusto offered to sell Ford another eighth of a kilogram of heroin, which Giusto had left at the pizzeria, but Ford declined (Count 8).

On June 18, 1984, while two men stood guard looking up and down the street, Gambina was observed removing two "heavy" white pillowcases from Caffe Aiello; Gambina later unloaded them at Tony Aiello's house. Later that day, Ford spoke with Giusto and indicated that he wished to purchase one-eighth kilogram of heroin. They agreed to meet outside a motel near LaGuardia airport. Ford met Giusto as planned, gave him $30,000, and agreed to meet at Tony's Pizza within the hour to pick up the heroin. Although Giusto never appeared at the pizzeria, Ford was given the heroin by Palmer, who indicated that Giusto had just left (Count 9).

Ford returned again to the pizzeria on October 30, 1984 and told Palmer that the heroin previously received was of poor quality and that he would confront Aiello himself if the problem continued. That evening, Ford purchased a large quantity of heroin from Giusto and Gambina; the latter two then drove directly to Caffe Aiello and met with Aiello.[1] On November 5, 1984, Ford, accompanied by another undercover agent, told Palmer that they were on their way to Caffe Aiello to confront "Tony" about the poor quality of the heroin. As soon as they had departed, Palmer called the cafe and, within minutes, Aiello left the cafe.

On November 7, 1984, Ford arranged to meet Giusto at the Marriott Hotel near LaGuardia airport. Prior to that meeting, Giusto and Gambina delivered a rolled-up shopping bag to Palmer, who then sold, from the pizzeria, various amounts of cocaine to three purchasers (Count 12). The buyers immediately were arrested, and the police found on them, in addition to the drugs, a scrap of paper with telephone numbers for Tony's Pizza, Giusto's residence and Caffe Aiello. When Ford and Giusto later met at the hotel, Giusto acknowledged that "Tony" was his boss in the drug business, that all the heroin purchased by Ford had been Tony's, and that,

---

1. Aiello was charged with this sale in Count 11, but was acquitted.

while Giusto was a "general" in the operation, Aiello was the "president."

On November 14, 1984, a number of individuals involved in Aiello's drug enterprise were arrested and several places, including the pizzeria, the cafe and various residences, were searched. The search revealed an assortment of evidence, including (1) records of drug sales and large quantities of heroin from Giusto's residence; (2) $898,127 (most of which was covered by "Tony's Pizza" T-shirts) from Vito Aiello's residence; of that amount, $30,000 was traced to an October 10, 1984 drug sale; and (3) a narcotics ledger book, $105,000 in currency, $370,805 in jewelry and a variety of weapons from Tony Aiello's residence.

Aiello avoided arrest and lived as a fugitive for approximately two years. On November 13, 1986, following a high-speed car chase, Aiello was arrested. There is evidence of Aiello's lavish lifestyle before and after becoming a fugitive. There also is evidence that, with few exceptions, Aiello kept all of his property in the names of others and regularly used cash and third-party checks, almost always in amounts less than $10,000, so as to avoid filing currency transaction reports. *See* 31 U.S.C. §§ 5311–5313 (1982 & Supp. IV 1986).

Detective Ford's testimony included an interpretation of one of Giusto's statements made during their November 7, 1984 meeting. The comment he interpreted, "I don't know about this other thing," came in response to the query as to whose drugs were better, "this other" or "Tony's." Ford testified that he understood the response to mean "[t]hat there was no other thing, everything I bought came from the same place or source."

During its final instructions to the jury, the court charged that Aiello might be found guilty of the distribution and possession counts under a theory of aiding and abetting, "that is, if he aids or abets another to commit an offense, he is just as guilty of the crime as the person who commits it directly." The court also undertook an ex-

planation of the "continuing series of violations" element of the CCE count. As part of that instruction, the court charged the jury that it could rely on violations "found in acts not even mentioned in the indictment at all, as long as Aiello had the intent to violate the narcotics laws when he committed these acts."

On March 18, 1988, following his conviction, Aiello was sentenced to 15 years imprisonment, a $25,000 fine and lifetime special parole terms on Counts 2–9; 20 years imprisonment, a $250,000 fine and a lifetime special parole term on Count 12; and life imprisonment without parole and a $100,000 fine on Count 15. The sentences all run consecutively.

On appeal, Aiello challenges the sufficiency of the evidence supporting the distribution and possession counts and the CCE count. He also challenges (1) the district court's instruction allowing the jury to consider, for the CCE predicates, acts not found in the indictment, (2) the admission into evidence of the undercover agent's testimony interpreting a co-conspirator's statement, and (3) the excessiveness of the sentence. For the reasons that follow, we affirm the judgment of the district court.

## DISCUSSION

### 1. *Sufficiency of the Evidence*

#### A. *The Distribution and Possession Counts*

■ Aiello asserts that none of the counts raised in this appeal show that he "participated in those particular transactions, either as a principal or as an aider and abettor." Rather, Aiello urges that the evidence, at most, suggests that he withdrew from the enterprise, "leaving Giusto on his own with Gambina as the supplier." This argument is unpersuasive.

To convict a defendant under a theory of aiding and abetting the commission of a crime (Counts 2–5, 7, 9 and 12),[2] the government must prove: "(1) [the] commis-

---

**2.** Because the sale in Count 8 was not consummated, the conviction cannot be based on the alternative theory of aiding and abetting, *see*

*United States v. Wiley,* 846 F.2d 150, 154 (2d Cir.1988), but rather must be based upon constructive possession, discussed *infra.*

sion of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider and abettor, with (4) the specific intent that his act or omission bring about the underlying crime," *United States v. Wiley,* 846 F.2d 150, 154 (2d Cir.1988) (quoting *United States v. Zambrano,* 776 F.2d 1091, 1097 (2d Cir.1985)). To prove the third and fourth elements, however, the evidence need only "demonstrate that the person charged joined the venture, shared in it, and that his efforts contributed towards its success," *id.; see also United States v. Perry,* 643 F.2d 38, 46 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981). Whereas the evidence here may not have shown that Aiello "participated in every phase of the criminal venture," *United States v. Ciambrone,* 787 F.2d 799, 809 (2d Cir.) (quoting *United States v. Diecidue,* 603 F.2d 535, 557 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980)), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986), or that he was "the supplier on *each and every one* of the occasions charged," Aiello Br. at 30, it certainly was sufficient, when viewed "in the light most favorable to the government," *United States v. Martino,* 759 F.2d 998, 1002 (2d Cir.1985); *see Wiley,* 846 F.2d at 153, to support his convictions based on aiding and abetting.

Indeed, there is extensive evidence of Aiello's participation in the operation. Aiello owned the locations out of which the drug contacts and sales were made. In earlier years he handled the drug dealings himself and would help settle disputes concerning the transactions. Giusto, who was involved directly in all the charged sales (save possibly for the sale charged in Count 3), admitted to Ford that Aiello was his boss and that the drugs were and would be "Tony's." Giusto and Gambina often conferred with Aiello, and immediately after the drug sales on March 6, 1984 and October 30, 1984, drove directly to Caffe Aiello, where on the latter date they met with Aiello. Further, there is no indication in the record that Palmer denied Aiello's involvement when told by Ford on October 30, 1984 and November 5, 1984 that he would contact Aiello directly. In fact, Palmer called the cafe on October 30th, presumably to warn Aiello. Thus, while the evidence may not suggest that Aiello participated *directly* in each possession and distribution violation subject of his appeal, certainly *"any* rational trier of fact could have found the essential elements of the crime" beyond a reasonable doubt, *Wiley,* 846 F.2d at 153 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

■ Under a theory of constructive possession, Aiello's conviction on Count 8, the unconsummated sale, also is supported by "substantial evidence," *id.* (quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). Aiello owned the pizzeria, was in charge of the workers, and instituted and controlled the drug activity. Because "[c]onstructive possession exists when a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object," which "may be proved by direct or circumstantial evidence," *United States v. Tribunella,* 749 F.2d 104, 111–12 (2d Cir.1984) (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed. 2d 85 (1973)), the jury properly found Aiello guilty on this count.

### B. *The Continuing Criminal Enterprise*

■ There also was substantial evidence to support Aiello's conviction under the continuing criminal enterprise statute, 21 U.S.C. § 848. Described as the kingpin statute, *see United States v. Young,* 745 F.2d 733, 751 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985), section 848 targets the ringleaders of large-scale narcotics operations, *United States v. Amen,* 831 F.2d 373, 381 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988).

■ To convict a defendant of engaging in a CCE, the government must prove (1)

that he committed a Title 21 drug felony violation, (2) that is part of a continuing series of Title 21 drug violations, (3) which are undertaken by such person in concert with five or more other persons, (4) with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (5) from which such person obtains substantial income or resources. *See Young*, 745 F.2d at 746–47; 21 U.S.C. § 848(b) (1982) (recodified at 21 U.S.C. § 848(d) (Supp. IV 1986)). At least three drug felony violations are required to establish a "series." *Young*, 745 F.2d at 747. The government need not plead or obtain convictions on any of the eligible predicate offenses, "but may instead simply prove at trial the continuing series of offenses." *Id.*

■ Aiello contends principally that the three felony predicates required for a "series" have not been established. He apparently concedes that the violation proved under Count 6 constitutes one predicate offense. Despite his assertion to the contrary, the conspiracy charged under 21 U.S.C. § 846 qualifies as a second predicate, *see Young*, 745 F.2d at 748–52. As for the required third predicate, Aiello argues that the jury must have used an aiding and abetting offense from Counts 2–5 or 7–12, but that an aiding and abetting offense cannot stand as a series predicate.

■ This argument as to the third predicate, however, is based on a faulty syllogism. Aiello argues, first, that each predicate drug offense must be sufficient not only to qualify as a Title 21 felony, but also as a single section 846 conspiracy violation. Aiello derives this theory from the "in concert" requirement of the CCE statute, citing *United States v. Sperling*, 560 F.2d 1050, 1055 (2d Cir.1977) ("to act 'in concert' to violate the law necessarily includes conspiracy to do so"). Aiello argues, second, that aiding and abetting rests upon different bases than does conspiracy. Combining these arguments, Aiello deduces that because the section 848 predicate must qualify as a section 846 conspiracy violation, it cannot be satisfied by an aiding and abetting offense. But this conclusion as-

sumes that the same act cannot support both conspiracy and aiding and abetting, a premise that is flawed, *see Nye & Nissen v. United States*, 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949); *United States v. Phillips*, 664 F.2d 971, 1009–10 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

In *Amen*, 831 F.2d at 381, we held "that because section 848 applies only to a person in charge of a CCE, one cannot incur [CCE] liability for aiding and abetting such a person." The *Amen* defendant escaped liability because he was not an employee of the criminal enterprise. The statute, we noted, was meant to target kingpins, not underlings. *See id.* The same reasoning led us to hold in *United States v. Benevento*, 836 F.2d 60 (2d Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988), that a "mere employee[ ] of [the] enterprise" who did not "coordinate[ ] or manage[ ] five or more individuals in the conduct of the enterprise" could not be convicted of CCE under a theory of aiding and abetting. *Id.* at 71. Unlike the defendants in those two cases, however, Aiello is a kingpin. We do not read our earlier opinions to shield kingpins from CCE liability solely because they are convicted as aiders and abettors rather than as principals with regard to the predicate crimes. We therefore hold that a drug felony violation based upon aiding and abetting may qualify as a "series" predicate where, as here, the aider and abettor is a kingpin.

■ The evidence is sufficient to sustain the remaining elements of section 848. Any rational jury could have found that Aiello organized, supervised or managed at least five people, from among Giusto, Palmer, Gambina, Robinson, Boyd, Vito Aiello, Jane Aiello, DiGangi (whose initials, D.D., appear in the drug ledger found in Aiello's residence) and others. As Aiello concedes, he need not have acted in concert with all of the five at the same time, *see Young*, 745 F.2d at 747, he need not have had personal contact with each of the five, *see United States v. Cruz*, 785 F.2d 399, 407 (2d Cir.1986), and he need not have exercised the same type of management or

supervision over each, *see id.* Aiello urges that he cannot be convicted because the jury did not specify which five persons, or for that matter, which three predicates, it relied upon. Aiello should not be heard to complain, however, because at trial he initially objected to the use of a special interrogatory on these issues. Although he later changed his position, the jury had been deliberating for four hours. The district court did not abuse its discretion in ruling that this request came "too late."

### 2. *Aiello's Other Contentions*

■ Aiello contends that the district court erred in instructing the jury that for the CCE series it could rely on violations not charged in the indictment. However, "an indictment charging a violation of § 848 need not 'specify each violation constituting the continuing series of violations....'" *Young*, 745 F.2d at 747 (quoting *United States v. Sperling*, 506 F.2d 1323, 1344 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)). Hence, the government need not specifically plead, let alone obtain convictions on, any of the predicate offenses; it simply must prove at trial a continuing series of at least three felony offenses. *Id.*

■ Detective Ford's testimony regarding the meaning of one of Giusto's statements made during their November 7, 1984 meeting properly was admitted. Aiello is correct that there was no attempt in this case to qualify Ford as an expert witness. But the testimony was admissible as an opinion by a lay witness under Fed.R.Evid. 701 because the "language on the tape[ ] is sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that are clear only to [the conversants]," *United States v. De Peri*, 778 F.2d 963, 977 (3d Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986). Moreover, the district court here "vigorously policed the government's examination," *id.* at 978, preventing Ford from telling the jury about whom he thought Giusto was speaking of

when Giusto mentioned "Tony" at numerous points in the conversation.

■ Finally, Aiello's argument that his sentences are "grossly disproportionate" to the crimes also must be rejected. A sentence imposed by a district court is entitled to "substantial deference," *Solem v. Helm*, 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983), and, upon review, an appellate court may consider only "whether the sentence ... is within constitutional limits," *id.* at 290 n. 16, 103 S.Ct. at 3009 n. 16; *see United States v. Gaggi*, 811 F.2d 47, 63 (2d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). Factors to be considered in assessing constitutional proportionality include the gravity of the offense, the harshness of the penalty, and the sentences imposed on other criminals for the same type of crimes. *Solem*, 463 U.S. at 292, 103 S.Ct. at 3011.

■ Aiello was sentenced to life imprisonment without parole on Count 15, plus 140 consecutive years on the other counts. Eighth amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence. As the Supreme Court once explained, "[i]f [the defendant] has subjected himself to a severe penalty, it is simply because he has committed *a great many* such offences," *O'Neil v. Vermont*, 144 U.S. 323, 331, 12 S.Ct. 693, 696, 36 L.Ed. 450 (1892) (quoting *State v. O'Neil*, 58 Vt. 140, 2 A. 586 (1886)).

The sentence of life imprisonment without parole indeed is harsh. The offense, however, is a grave one. Aiello was a large supplier of hard drugs to wholesale distributors for an extended period of time. For crimes such as his, life sentences have been found appropriate. *See, e.g., Williams v. United States*, 731 F.2d 138, 139 (2d Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985); *United States v. Barnes*, 604 F.2d 121, 156 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). The district court did not abuse its substantial discretion in choosing an appropriate sentence.

We have considered Aiello's remaining contentions and find them meritless.

### CONCLUSION

The judgment of the district court is affirmed.