IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**STATE OF ARIZONA,**
*Respondent,*

*v.*

**MARTIN RAUL SOTO-FONG,**
*Petitioner.*

**STATE OF ARIZONA,**
*Respondent,*

*v.*

**WADE NOLAN CLAY,**
*Petitioner.*

**STATE OF ARIZONA,**
*Respondent,*

*v.*

**MARK NORIKI KASIC JR.,**
*Petitioner.*

Nos.  CR-18-0595-PR
CR-18-0489-PR
CR-19-0379-PR
(Consolidated)
Filed October 9, 2020

Appeal from the Superior Court in Pima County
The Honorable Peter W. Hochuli, Judge
No.  CR039599
AFFIRMED

Memorandum Decision of the Court of Appeals
Division Two
No.  2 CA-CR 18-0181 PR
Filed November 9, 2018
AFFIRMED

Appeal from the Superior Court in Mohave County
The Honorable Richard D. Lambert, Judge
No.  S8015CR13572
AFFIRMED

Memorandum Decision of the Court of Appeals
Division One
No.  1 CA-CR 18-0463 PRPC
Filed September 13, 2018
AFFIRMED

Appeal from the Superior Court in Pima County
The Honorable Kathleen Quigley, Judge
No.  CR20084770
AFFIRMED

Opinion of the Court of Appeals
Division Two
No.  2 CA-CR 19-0143 PR
Filed November 7, 2019
AFFIRMED

———————————

COUNSEL:

Barbara LaWall, Pima County Attorney, Jacob R. Lines (argued), Deputy County Attorney, Tucson, Attorneys for State of Arizona

Amy Armstrong, Sam Kooistra (argued), Arizona Capital Representation Project, Tucson, Attorneys for Martin Raul Soto-Fong and Mark Noriki Kasic, Jr.

Matthew J. Smith, Mohave County Attorney, Reed Weisberg (argued), Deputy County Attorney, Kingman, Attorneys for State of Arizona

Randy McDonald (argued), Perkins Coie LLP, Phoenix; C. Kenneth Ray, II, C. Kenneth Ray PLLC, Prescott; and Katherine Puzauskas, Robert Dormady, Sandra Day O'Connor College of Law Post-Conviction Clinic, Phoenix, Attorneys for Wade Nolan Clay

Amy P. Knight, Knight Law Firm, LLC, Tucson, Attorney for Amicus Curiae Arizona Attorneys for Criminal Justice

Mark Brnovich, Arizona Attorney General, Michael T. O'Toole, Chief Counsel, Criminal Appeals Section, Andrew Stuart Reilly, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General

John R. Mills, Phillips Black, Inc., Oakland, CA, Attorney for Amicus Curiae Phillips Black, Inc.

JUSTICE LOPEZ authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, GOULD, BEENE, and PELANDER (RETIRED)[*] joined.

JUSTICE LOPEZ, opinion of the Court:

¶1        We consider whether consecutive sentences imposed for separate crimes, when the cumulative sentences exceed a juvenile's life expectancy, violate the Eighth Amendment's prohibition against "cruel and unusual punishments." We conclude that such de facto life sentences do not violate the Eighth Amendment, as interpreted in *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). Consequently, *Graham*, *Miller*, and *Montgomery* do not constitute a significant change in the law under Arizona Rule of Criminal Procedure 32.1(g).

---

[*] Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable John Pelander, Justice of the Arizona Supreme Court (Retired), was designated to sit in this matter.

## BACKGROUND

¶2         Wade Clay was seventeen when he murdered one victim and attempted to murder a second.  In 1991, a jury convicted Clay of first degree murder of J.M. (Count 1), attempted murder of A.M. (Count 2), and aggravated assault of A.M. (Count 3).  At sentencing, the trial court considered Clay's age but found that it was not a mitigating factor because he was not an "immature child."  The court sentenced Clay to life with the possibility of parole after twenty-five years on Count 1 and imposed concurrent terms of twelve and nine years for Counts 2 and 3 respectively, to run consecutive to the life sentence.  The court of appeals denied Clay's requested relief in his most recent post-conviction proceeding.  *State v. Clay*, No. 1 CA-CR 18-0463, 2018 WL 4374418, at *1 ¶ 4 (Ariz. App. Sept. 13, 2018) (mem. decision).  Clay is now eligible for parole on the life sentence.

¶3         Mark Kasic committed six arsons and one attempted arson between August 2007 and August 2008.  He committed four of those crimes while he was seventeen and the others after he turned eighteen.  The arsons destroyed three houses and numerous vehicles, severely burned a homeowner, and caused extensive property damage.  All the arsons were committed while occupants were asleep in their homes.  A jury convicted Kasic on thirty-two counts—including six counts of arson of an occupied structure, fifteen counts of endangerment, one count of attempted arson of an occupied structure, and one count of aggravated assault.  The trial court sentenced Kasic to enhanced concurrent and consecutive prison sentences totaling nearly 140 years.  The court of appeals affirmed Kasic's convictions and sentences, distinguishing *Graham* because "different considerations apply to consecutive term-of-years sentences based on multiple counts and multiple victims."  *State v. Kasic*, 228 Ariz. 228, 233–34 ¶ 26 (App. 2011).

¶4         A jury convicted Martin Raul Soto-Fong of three counts of first degree murder, one count of armed robbery, two counts of attempted armed robbery, one count of aggravated robbery, and two counts of attempted aggravated robbery arising from a robbery of a market. The trial court sentenced Soto-Fong to death.  That sentence, however, was vacated in light of *Roper v. Simmons*, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were

committed."). The trial court then sentenced Soto-Fong to three consecutive life sentences without the possibility of release for twenty-five years. The court of appeals denied Soto-Fong's requested relief in his most recent post-conviction proceeding, finding that *Miller* did not apply to his aggregate prison term. *State v. Soto-Fong*, No. 2 CA-CR 18-0181, 2018 WL 5883908, at *1 ¶¶ 4–5 (Ariz. App. Nov. 9, 2018) (mem. decision). Soto-Fong will not be eligible for release until he has served 109 years of imprisonment.

¶5 Petitioners argue that their sentences violate the Eighth Amendment and request that we remand their cases to the trial court to fashion constitutional sentences. We consolidated these cases to resolve the common question of whether *Graham*, *Miller*, and *Montgomery* prohibit aggregated consecutive sentences for separate crimes that exceed a juvenile's life expectancy, a recurring issue of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

# I.

¶6 Whether the Eighth Amendment prohibits de facto life sentences for juveniles is a matter of constitutional interpretation that we review de novo. *Heath v. Kiger*, 217 Ariz. 492, 494 ¶ 6 (2008).

## A.

¶7 *Graham* involved a sixteen-year-old defendant who was charged with armed burglary by assault or battery and attempted armed robbery. 560 U.S. at 53–54. Graham pleaded guilty to both charges pursuant to a plea agreement. *Id.* at 54. The trial court withheld adjudication of guilt and sentenced Graham to concurrent three-year terms of probation. *Id.* Six months later, Graham was arrested for his role in two robberies that resulted in the shooting of one of his co-conspirators. *Id.* at 54–55.

¶8 After his second arrest, the court revoked Graham's probation and found him guilty of the earlier armed burglary and attempted armed robbery charges. *Id.* at 57. The court sentenced Graham to life imprisonment for the armed burglary and fifteen years of imprisonment for the attempted armed robbery. *Id.* At the time, because Florida had no

parole system, Graham had no possibility of release save executive clemency. *Id.* Graham challenged his sentence under the Eighth Amendment, and the United States Supreme Court eventually addressed that challenge on certiorari. *Id.* at 58.

¶9 When evaluating categorical rules under the Eighth Amendment, the Supreme Court first considers the "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine if there is a national consensus against the contested sentencing practice. *Id.* at 61 (quoting *Roper*, 543 U.S. at 563). The Court then considers whether the Eighth Amendment's "text, history, meaning, and purpose" in light of the Court's "independent judgment" makes the punishment in question unconstitutional. *Id.* (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008)).

¶10 Reasoning that the "most reliable" evidence of a national consensus is legislation enacted by the states, the *Graham* Court noted that a majority of states, thirty-seven, permitted a life without parole sentence for juveniles. *Id.* at 62. Despite this clear consensus and logical stopping point, the Court shifted its focus to the number of juvenile offenders serving parole-ineligible life sentences, as quantified in a non-peer-reviewed study based upon incomplete data. *Id.* at 62–63. The Court then concluded that, because it could find only 124 cases involving parole-ineligible juvenile life sentences, a national consensus against such sentences must exist. The Court dismissed criticisms of the flawed study and faulted Florida for not producing its own countervailing study or data. *Id.* at 63. *Graham*'s analysis of the national consensus against parole-ineligible juvenile life sentences is, at best, dubious. *Id.* at 107 (Scalia, J., dissenting) ("No plausible claim of a consensus against this sentencing practice can be made in light of this overwhelming legislative evidence."); *see also State v. Slocumb*, 827 S.E.2d 148, 153 n.9 (S.C. 2019) ("The so-called consensus against sentencing juvenile offenders to life without parole could not be found in the laws of this country, for the vast majority of states did not forbid such a sentence.").

¶11 Having glided past the "most reliable" measure of national consensus—the duly enacted laws of the state legislatures—in favor of an analytically novel metric, the Court attempted to bolster its conclusion by invoking the "judgments of other nations and the international community." *Graham*, 560 U.S. at 80. After acknowledging that

considerations of foreign judgments were not dispositive, the Court noted that they were "not irrelevant." *Id.* (quoting *Enmund v. Florida*, 458 U.S. 782, 796 n.22 (1982)). Relying on a single study about the sentencing practices of other nations, the Court observed that the United States stood alone in subjecting juveniles to parole-ineligible sentences. *Id.* at 80–81.

**¶12** We pause here to express our concern with the Court's reliance on international laws and judgments to resolve an issue raised under the United States Constitution, particularly when they are invoked to justify the Court's disregard of the "most reliable" evidence of national consensus: the will of the American people as expressed through their state laws. Such implicit deference to foreign decisions runs the risk of ceding to foreign governments "what our laws and our Constitution mean, and what our policies in America should be." 151 Cong. Rec. S3109 (daily ed. Mar. 20, 2005) (statement of Sen. Cornyn). "While Congress, as a *legislature*, may wish to consider the actions of other nations on any issue it likes, . . . Eighth Amendment jurisprudence should not impose foreign moods, fads, or fashions on Americans." *Foster v. Florida*, 537 U.S. 990, 990 n.* (2002) (Thomas, J., concurring in the denial of certiorari). After all, our Constitution was the product of our nation consciously breaking away from its old-world origins and embedding distinctively American values and principles into our rule of law.

**¶13** After assessing the national consensus and international norms, the Court held that the federal Constitution "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham*, 560 U.S. at 82. The Court clarified that the state "need not guarantee the offender eventual release," but must provide him with a "realistic opportunity" to obtain release. *Id.* While the Eighth Amendment "does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life," the state may not make that judgment solely on the crime committed. *See id.* at 75.

**¶14** *Graham*'s holding is premised on the concept of proportionality. *Id.* at 59. The Supreme Court addresses proportionality in two ways: (1) challenges to the length of a sentence in relation to the circumstances in the case, and (2) court-imposed categorical restrictions on penalties. *Id.* *Graham* expanded the second category to include juvenile

offenders sentenced to life without the possibility of parole for a non-homicide offense.  *See id.* at 60–61.

¶15        The Supreme Court did not address Graham's fifteen-year sentence for the attempted armed robbery.  Instead, *Graham*'s holding considered only his life sentence for armed burglary and stated that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."  *Id.* at 82.  No more, no less.

**B.**

¶16        *Miller* involved the consolidated cases of two fourteen-year-old defendants, Kuntrell Jackson and Evan Miller.  Jackson participated in a robbery during which his co-conspirator shot and killed a video store clerk.  *Miller*, 567 U.S. at 465–66.  A jury convicted Jackson of capital felony murder and aggravated robbery and a judge sentenced him, consistent with Arkansas law, to life without parole.  *Id.* at 466; *see also* Ark. Code Ann. § 5-4-104(b) (1997) ("A defendant convicted of capital murder or treason shall be sentenced to death or life imprisonment without parole.").

¶17        Miller and an accomplice were drinking with a neighbor who lost consciousness.  *Miller*, 567 U.S. at 468.  Miller and his accomplice attempted to steal $300 from the neighbor's wallet.  *Id.*  The neighbor awoke, a struggle ensued, and Miller struck the neighbor repeatedly with a baseball bat.  *Id.*  Miller and his accomplice later returned to set the neighbor's trailer ablaze.  *Id.*  The state charged Miller with murder in the course of arson.  *Id.*  A jury convicted Miller, and a judge sentenced him to life without parole.  *Id.* at 468–69; *see also* Ala. Code §§ 13A–5–40(a)(9), 13A-6-2(c) (1982).  The defendants' Eighth Amendment challenges to their sentences ultimately reached the Supreme Court.

¶18        The *Miller* Court abandoned *Graham*'s analytical approach—counting the number of juveniles in the country serving a similar sentence—to determine the existence of a national consensus.  Instead, the Court declared a national consensus against parole-ineligible life sentences for juveniles for homicide offenses because only twenty-nine jurisdictions permitted the sentencing practice.  Thus, although a majority of states permitted such sentences, the Court concluded that there was a consensus

*against* the practice because fewer states allowed it than the practice foreclosed in *Graham*. *Miller*, 567 U.S. at 483–84. The Court emphasized that many jurisdictions did not explicitly authorize life without the possibility of parole for juveniles convicted of homicide, but instead relied on statutes that transfer juveniles to adult courts for prosecution to achieve that outcome. *Id.* at 485. The Court then dismissed the significance of the states' sanctioned practice of allowing parole-ineligible juvenile life sentences through adult court transfer statutes because "it was impossible to say whether the legislatures had endorsed" the practice. *Id.*

¶19 Thus, the *Miller* Court expanded *Graham*, stating that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. The Court held that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489. To effectuate this directive, the Court held that a trial court must consider "an offender's youth and attendant characteristics" before sentencing a juvenile to life without the possibility of parole. *See id.* at 483.

## C.

¶20 *Montgomery* involved a seventeen-year-old defendant who murdered a deputy sheriff. 136 S. Ct. at 725. In 1963, Louisiana charged Montgomery with murder and a jury convicted him as "guilty without capital punishment," resulting in a life sentence without parole. *Id.* at 725–26. The Court held that, because *Miller* was substantive and therefore retroactively applicable, a trial court must determine if Montgomery was "irreparably corrupt" when he murdered a deputy sheriff fifty-three years previously, or afford him an opportunity for release. *Id.* at 736–37.

¶21 *Montgomery* muddied the Eighth Amendment jurisprudential waters with its construction of *Miller*. *See id.* at 743 (Scalia, J. dissenting). The majority in *Montgomery* asserted that *Miller* had invalidated life without parole sentences for "a class of defendants because of their status." *Id.* (internal quotations omitted). Ultimately, the majority concluded that *Miller* "bar[red] life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.*

¶22 As Justice Scalia clarified in his *Montgomery* dissent, *Miller* did not enact a categorical ban; it merely mandated that trial courts "*follow a certain process*—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* (quoting *Miller*, 567 U.S. at 483). Justice Scalia further chided the majority for its reliance on dicta from *Miller* to rewrite its holding. *Id.*; *see also State v. Valencia*, 241 Ariz. 206, 211 ¶ 26 (2016) (Bolick, J., concurring) ("Searching in vain to find such a substantive rule in *Miller*, the Court instead created one in *Montgomery*, reasoning that the unannounced rule that courts make a finding of 'irreparable corruption' before sentencing a juvenile offender to life imprisonment without parole was implicit in the earlier case.") (internal citation omitted).

¶23 We agree with Justice Scalia. *Miller*'s holding was narrow—a trial court must consider certain factors before sentencing a juvenile to life without the possibility of parole. 567 U.S. at 483. *Miller* did *not* impose a categorical ban on parole-ineligible life sentences for juveniles. *Id.* ("Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*.").

## II.

¶24 The Supreme Court's Eighth Amendment jurisprudence concerning parole-ineligible life sentences for juveniles has left the nation's courts in a wake of confusion. State courts and federal circuits have reached disparate resolutions of these cases. *See Slocumb*, 827 S.E.2d at 158–66 (collecting cases). Today, we sift through the Court's opinions to determine the applicability of *Graham*, *Miller*, and *Montgomery* to Petitioners' cases.

### A.

¶25 "Eighth Amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence." *United States v. Aiello*, 864 F.2d 257, 265 (2d Cir. 1988). In *Graham*, the Court noted that it was examining the specific "sentencing practice" of mandatory parole-ineligible life sentences for juveniles who commit non-homicide offenses. 560 U.S. at 61. In *Miller*, the sentencing practice concerned mandatory parole-ineligible life sentences for juveniles convicted of homicide. 567 U.S. at 479. *Graham*, *Miller*, and *Montgomery* involved

juvenile defendants sentenced to life without parole for a single crime. Here, Petitioners received very different sentences—each received multiple sentences for multiple crimes which, in the aggregate, resulted in terms of incarceration that will or may exceed their life expectancy.

¶26 Petitioners argue that *Graham*, too, involved multiple criminal acts and, thus, its reasoning applies to their cases. We disagree. Petitioners ignore *Graham*'s facts and holding. Although Graham was convicted and sentenced for multiple offenses, his contested sentence arose from a single crime, the July 2003 burglary. *Graham*, 560 U.S. at 57–58. The Court was silent on his other convictions and sentences. *See id.* at 54, 57. Likewise, in *Miller*, the Court addressed only the defendants' homicide-related sentences, 567 U.S. at 468–69, and in *Montgomery*, the Court considered only the sentence for murder, 136 S. Ct. at 725. Thus, *Graham* and its progeny did not involve contested consecutive sentences arising from multiple crimes.

¶27 Numerous courts considering this issue have concluded that *Graham* and *Miller* are inapplicable to de facto juvenile life sentences. *See, e.g.*, *Vasquez v. Commonwealth*, 781 S.E.2d 920, 928 (Va. 2016) ("*Graham* does not apply to aggregate term-of-year sentences involving multiple crimes . . . ."); *Slocumb*, 827 S.E.2d at 158–66 (collecting cases). We join these courts in holding that, because Petitioners' sentences are not parole-ineligible life sentences for a single conviction, but rather aggregated sentences for multiple crimes, *Graham* and its progeny do not afford Petitioners relief.

**B.**

¶28 *Graham*, *Miller*, and *Montgomery* do not involve de facto life sentences for juveniles, nor do their holdings implicate such sentences.

¶29 We "will not consider the imposition of consecutive sentences in a proportionality inquiry." *State v. Berger*, 212 Ariz. 473, 479 ¶ 27 (2006) (quoting *State v. Davis*, 206 Ariz. 377, 387 ¶ 47 (2003)). "Eighth Amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence." *Id.* ¶ 28 (quoting *Aiello*, 864 F.2d at 265). "Thus, if the sentence for a particular offense is not disproportionately long, it does not become so merely because it is consecutive to another sentence for a

separate offense or because the consecutive sentences are lengthy in aggregate." *Id.* (concluding such a proposition holds even if the total sentences exceed a normal life expectancy); *see also Ewing v. California*, 538 U.S. 11, 28 (2003) (upholding a sentence of twenty-five years to life for felony grand theft based on the defendant's prior convictions).

¶30 Although *Berger* and *Ewing* analyzed the length of sentences relative to the crime's circumstances, their logic is relevant here because, generally, courts do not permit defendants to "stack" their crimes to generate an Eighth Amendment claim. *See, e.g.*, *Commonwealth v. Foust*, 180 A.3d 416, 436 (Pa. 2018) ("Contrary to the arguments made by Appellant at oral argument, there is nothing in *Roper*, *Graham*, and/or *Miller* that speaks to volume discounts for multiple crimes."); *see also Hawkins v. Hargett*, 200 F.3d 1279, 1285 n.5 (10th Cir. 1999) (refusing to apply increased proportionality review because a juvenile's aggregated consecutive sentences totaled more than 100 years). Proportionality review is prohibited in this context because such an approach would produce "the ridiculous consequence of enabling a prisoner, simply by recidivating, to generate a colorable Eighth Amendment claim." *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001); *see also Foust*, 180 A.3d at 434 ("Moreover, extensive case law in this jurisdiction holds that defendants convicted of multiple offenses are not entitled to a 'volume discount' on their aggregate sentence.").

¶31 Thus, we reject the notion that *Graham* and *Miller* implicate a juvenile's de facto life term resulting from multiple consecutive sentences. *See Lucero v. People*, 394 P.3d 1128, 1132 ¶ 15 (Colo. 2017) ("*Graham* and *Miller* apply only where a juvenile is sentenced to the specific sentence of life without the possibility of parole for one offense."); *Bunch v. Smith*, 685 F.3d 546, 550 (6th Cir. 2012) ("[*Graham*] did not clearly establish that consecutive, fixed-term sentences for juveniles who commit multiple nonhomicide offenses are unconstitutional when they amount to the practical equivalent of life without parole."). The Supreme Court has neither expanded its analysis in these cases to sentences other than life without the possibility of parole nor addressed the impact of consecutive sentences imposed for separate crimes. *See State v. Ali*, 895 N.W.2d 237, 246 (Minn. 2017). Indeed, it has not squarely addressed whether consecutive sentences should be considered in a proportionality review of an adult offender's sentence. *See id.*; *see also O'Neil v. Vermont*, 144 U.S. 323, 331

(1892) (quoting, in dictum, a state court's reasoning that "[t]he mere fact that cumulative punishments may be imposed for distinct offenses in the same prosecution is not material" to the Eighth Amendment inquiry).

### C.

**¶32** As *Graham*, *Miller*, and *Montgomery* afford Petitioners no harbor in their holdings, they seek refuge in the cases' dicta. This Court, of course, is bound to follow applicable holdings of United States Supreme Court decisions, but not mere dicta or other statements that allegedly bear on issues neither presented nor decided in such decisions. *Cf. State v. Mata*, 185 Ariz. 319, 327–28 (1996) (rejecting assertion that prior Supreme Court cases had specifically addressed or decided the issue before this Court). Thus, mere dicta offers Petitioners no relief. *See Town of Chino Valley v. City of Prescott*, 131 Ariz. 78, 81 (1981) (noting that dictum is "without force of adjudication" and "is not controlling as precedent").

**¶33** Soto-Fong points to *Graham*'s observation that a mandatory life without parole sentence "gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." *See* 560 U.S. at 79. Undoubtedly true, but this statement and others are superfluous to the scope of the Court's analysis and holding; the Court simply noted the obvious implication of mandatory life without parole sentences for non-homicide juvenile offenders. *Id.* Notably, the Court did not hold that juveniles *must* have a chance for "reconciliation with society." *See id.*

**¶34** Many courts that have interpreted *Graham* and *Miller* to prohibit de facto juvenile life sentences have also relied on dicta or otherwise discounted the cases' narrow holdings. *See Slocumb*, 827 S.E.2d at 162–65 (listing states that find *Graham* and *Miller* apply to de facto life sentences). For example, in *Moore v. Biter*, the Ninth Circuit held that *Graham* applied to de facto life sentences after concluding that the facts in *Graham* were "materially indistinguishable" from the facts before it. 725 F.3d 1184, 1186 (9th Cir. 2013). Graham was sentenced to life without the possibility of parole for committing an armed burglary. *Graham*, 560 U.S. at 57. By contrast, Moore sexually victimized four women in separate incidents during a five-week period. 725 F.3d at 1186. Following Moore's convictions, the trial court imposed consecutive sentences requiring him to serve 127 years in prison before reaching parole eligibility. *Id.* at 1187.

Despite the differences in Graham and Moore's convictions and sentences, the Ninth Circuit concluded that *Graham*'s holding foreclosed Moore's de facto life sentence. *Id.* at 1192–93.

¶35        We find *Moore*'s holding untenable and, instead, concur with the dissent from rehearing en banc which concluded that *Graham* did not apply to Moore's situation, much less prohibit his sentences. *Moore v. Biter*, 742 F.3d 917, 917–919 (9th Cir. 2014) (O'Scannlain, J., dissenting), *denying reh'g en banc to* 725 F.3d 1184 (9th Cir. 2013) (noting that the panel failed to "confront the most meaningful distinction between Moore's case and *Graham*: Moore's term of imprisonment is composed of over two dozen separate sentences . . . Graham's is one sentence").

**D.**

¶36        Having concluded that *Graham*, *Miller*, and *Montgomery* do not preclude de facto juvenile life sentences, we note another reason to decline to invoke the cases' dicta to extend this jurisprudence. To do so would invariably require us to assume the legislative prerogative to establish criminal sentences. *See Berger*, 212 Ariz. at 483 ¶ 50 ("[T]he fixing of prison terms for specific crimes . . . is properly within the providence of the legislature, not courts.") (quoting *Harmelin v. Michigan*, 501 U.S. 957, 998 (1991) (Kennedy, J., concurring in part)).

¶37        Petitioners' requested relief raises myriad practical questions about how to effectuate it. Judge O'Scannlain addressed the impracticability of judicially crafting a juvenile sentencing scheme in his *Moore* dissent:

> At what number of years would the Eighth Amendment become implicated in the sentencing of a juvenile: twenty, thirty, forty, fifty, some lesser or greater number? . . . Could the number [of years] vary from offender to offender based on race, gender, socioeconomic class or other criteria? Does the number of crimes matter? Also, what if the aggregate sentences are from different cases? From different circuits? From different jurisdictions? If from different jurisdictions, which jurisdiction must modify its sentence or sentences to avoid constitutional infirmity?

14

742 F.3d at 922 (O'Scannlain, J., dissenting) (internal citations and quotation marks omitted). Implementation of Petitioners' requested relief would require this Court to devise a juvenile sentencing scheme out of whole cloth. We decline the invitation to do so because it "would require a proactive exercise inconsistent with our commitment to traditional principles of judicial restraint." *Vasquez*, 781 S.E.2d at 928.

¶38 Indeed, courts that have held de facto juvenile life sentences unconstitutional provide a cautionary tale, as they have invariably usurped the legislative prerogative to devise a novel sentencing scheme or otherwise delegated the task to trial courts to do so. For example, following its reversal of a juvenile's aggregate forty-five-year sentence as violative of *Miller*, the Wyoming Supreme Court dipped its toe in the legislative water, noted that federal sentencing guidelines equate 470 months to a life sentence, but declined to adopt any standard for defining a "life sentence." *Bear Cloud v. State*, 334 P.3d 132, 142–44 (Wyo. 2014). In so doing, the *Bear Cloud* Court also rejected the defendant's span-of-life projections based on data estimating that the life expectancy of incarcerated juvenile offenders is lower than the general population's. *Id.* at 142. Ultimately, the court thrust the legislative pen in the trial court's hand to devise a sentencing scheme under the guise of "weigh[ing] the entire sentencing package" on remand. *Id.* at 143.

¶39 Here, Petitioners invite us to invade the province of the legislature. Petitioners' shifting approach to this issue demonstrates the folly of doing so. Initially, Petitioners asserted that we may not declare a bright-line rule for defining a life sentence due to variations in life expectancy for various racial groups. Petitioners then suggested that the legislature has previously determined that a sentence of twenty-five years constitutes a life sentence because a defendant is eligible for release after twenty-five years when sentenced to life with the possibility of release. The wide-ranging considerations necessary to resolve what is quintessentially a policy question militate in favor of deference to the legislature. *See Harmelin*, 501 U.S. at 998 (Kennedy, J., concurring in part) ("[T]he fixing of prison terms for specific crimes involves a substantial penological judgment that, as a general matter, is 'properly within the province of the legislature, not courts.'") (quoting *Rummel v. Estelle*, 445 U.S. 263, 275–76 (1980)); *Graham*, 560 U.S. at 120 (Scalia, J., dissenting) ("The question of what acts

15

are 'deserving' of what punishments is bound so tightly with questions of morality and social conditions as to make it, almost by definition, a question for legislative resolution.").

¶40 Despite the shifting and confusing reasoning embodied in *Graham*, *Miller*, and *Montgomery*, we are bound by the Supremacy Clause to faithfully apply this jurisprudence as we fairly construe it. *Davis*, 206 Ariz. at 384 ¶ 34 n.4. But because those cases do not address or implicate de facto juvenile life sentences, we decline Petitioners' invitation to expand this jurisprudence one step beyond its reach. Our respect for the separation of powers, the will of our citizens, and principles of judicial restraint, rather than dicta from inapposite cases, compel our decision. Thus, we hold that the Eighth Amendment does not prohibit de facto juvenile life sentences.

### III.

¶41 Petitioners also argue that the Arizona Constitution prohibits de facto life sentences for juveniles. This issue was not squarely raised for review, but because the parties have briefed the issue, we will address it. *Jimenez v. Sears, Roebuck & Co.*, 183 Ariz. 399, 406 n.9 (1995).

¶42 Our primary purpose when interpreting the Arizona Constitution is to "effectuate the intent of those who framed the provision." *Jett v. City of Tucson*, 180 Ariz. 115, 119 (1994). "When the language of a provision is clear and unambiguous, we apply it without resorting to other means of constitutional construction." *Heath*, 217 Ariz. at 494 ¶ 6. We may examine its history, if necessary, to determine the framers' intent. *Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 9, 12 (1986).

¶43 Article 2, section 15 of the Arizona Constitution is identical to the Eighth Amendment and prohibits "cruel and unusual punishment." The drafters of the Arizona Constitution elected to adopt the Eighth Amendment's wording and declined the committee's proposal of "cruel nor unusual punishment." *State v. Bartlett*, 164 Ariz. 229, 240–41 (1990), *vacated on other grounds*, 501 U.S. 1246 (1991). We have not interpreted article 2, section 15 to afford broader protection than its federal counterpart. *State v. McPherson*, 228 Ariz. 557, 563 ¶ 16 (App. 2012). Although we are not bound by federal precedent in interpreting our Constitution and we do not "follow federal precedent blindly," *Davis*, 206 Ariz. at 380, federal

precedent is highly persuasive when the federal and state constitutional provisions are identical.

¶44        Petitioners argue that article 2, section 15 prohibits de facto juvenile life sentences because the state constitutional framers intended greater protections for children.  We disagree.  Express protections for children were limited to children in the workforce.  *See* Rebecca White Berch, *Celebrating the Centennial: A Century of Arizona Supreme Court Constitutional Interpretation*, 44 Ariz. St. L.J. 461, 496 (2012) ("The delegates drafted child labor laws after seeing young children at work in smelters and mines.").  The delegates' desire to protect children manifests in article 18, section 2 of the Arizona Constitution, *id.* at 497, which prohibits "any child under sixteen years of age [to] be employed in underground mines, or in any occupation injurious to health or morals or hazardous to life or limb" and disallows children under fourteen from employment during school hours.  Ariz. Const. art. 18, § 2.  Nothing in the Arizona Constitution suggests article 2, section 15 exceeds Eighth Amendment protections for minors charged with crimes.

¶45        The State argues that the Arizona Constitution, specifically the Victim's Bill of Rights ("VBR"), favors de facto juvenile life sentences.  Specifically, the State contends that the VBR requires a sentencing court to consider victims individually; as such, prohibiting de facto life sentences would effectively deny victims justice because it would artificially cap a juvenile defendant's sentence.  But nothing in the VBR's text addresses this issue.  *See* Ariz. Const. art 2, § 2.1.  The State raises compelling issues that warrant consideration when considering penological goals, but they are best left to legislative deliberations.

## IV.

¶46        Having concluded that *Graham*, *Miller*, and *Montgomery* do not prohibit de facto juvenile life sentences, we turn to Petitioners' cases.

¶47        Under *Graham*, the State is not required to guarantee Clay release; it must only provide him with a "realistic opportunity" for release.  560 U.S. at 82.  Clay is now eligible for parole.  Moreover, the sentencing court considered Clay's age.  Although Clay contends that his sentencing failed to satisfy *Graham*'s requirements, we decline to address this claim

because his parole eligibility renders it moot. Thus, we deny Clay's requested relief.

**¶48** Kasic's case is clearly distinguishable from *Graham* and its progeny. Kasic's sentences arise from six separate arsons committed over the course of a year, including crimes he committed as an adult. His case bears no resemblance to *Graham*, *Miller*, or *Montgomery*, in which all the defendants received life sentences without the possibility of parole as punishment for a single crime. Consequently, we deny Kasic's requested relief.

**¶49** Although Soto-Fong's case bears some resemblance to the *Graham* cases because his sentences arise from a *single criminal episode*, the similarities end there. Soto-Fong was convicted of three first degree murders and his consecutive life sentences are the result of his multiple murder and robbery convictions, not from a *single conviction and sentence*. For this reason, we deny Soto-Fong's requested relief.

## CONCLUSION

**¶50** We hold that *Graham*, *Miller*, and *Montgomery* do not prohibit consecutive sentences imposed for separate crimes when the aggregate sentences exceed a juvenile's life expectancy. Consequently, *Graham* and its progeny do not represent a significant change in the law under Rule 32.1(g). Therefore, we affirm the court of appeals' decisions and the trial courts' judgments and sentences in Petitioners' cases, and we deny Petitioners' requested relief for resentencing.