IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA EX REL. RACHEL H. MITCHELL,
MARICOPA COUNTY ATTORNEY,
*Petitioner,*

*v.*

THE HONORABLE KATHERINE COOPER, JUDGE OF THE SUPERIOR COURT OF
THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Judge,*

LONNIE ALLEN BASSETT,
*Real Party in Interest.*

No. CR-22-0227-PR
**Filed September 18, 2023**

Appeal from the Superior Court in Maricopa County
The Honorable Katherine Cooper
No. CR2004-005097
**REVERSED**

Order of the Court of Appeals, Division One
No. 1 CA-SA 22-0152
Filed August 10, 2022

COUNSEL:

Rachel H. Mitchell, Maricopa County Attorney, Julie A. Done (argued), Deputy County Attorney, Jessi Wade, Deputy County Attorney, Maricopa County Attorney's Office, Phoenix, Attorneys for State of Arizona

Amy E. Bain (argued), Bain & Lauritano, P.L.C., Glendale, Attorney for Real Party in Interest Lonnie Allen Bassett

Kristin K. Mayes, Arizona Attorney General, Joshua Bendor, Solicitor General/Section Chief of Criminal Appeals, Eliza C. Ybarra, Assistant Attorney General, Criminal Appeals Section, Arizona Attorney General's Office, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General

Craig M. Waugh, Laura Sixkiller, DLA Piper LLP, Phoenix, Attorneys for Amici Curiae Kaleem Nazeem, Louis Gibson, Shakur Abdullah, and Greg Greenwood

Andrew T. Fox, Coppersmith Brockelman PLC, Phoenix; and Marsha L. Levick, Juvenile Law Center, Philadelphia, PA, Attorneys for Amici Curiae Juvenile Law Center, Campaign for the Fair Sentencing of Youth, and Human Rights for Kids

Gary Kula, Maricopa County Public Defender, Kevin D. Heade (argued), Deputy Public Defender, Maricopa County Public Defender's Office, Phoenix, Attorneys for Amicus Curiae Maricopa County Public Defender

Karen S. Smith, Randal McDonald, Arizona Justice Project, Phoenix, Attorneys for Amicus Curiae Arizona Justice Project

—————————

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, BEENE, and BERCH (RETIRED) joined.[*]

—————————

[*] Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, Justice Rebecca White Berch (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

2

JUSTICE KING, Opinion of the Court:

¶1   At age sixteen, Lonnie Bassett shot and killed two people. A jury convicted him on two counts of first degree murder. The trial court sentenced Bassett to natural life for one murder and life with the possibility of parole after twenty-five years for the other murder. We must determine whether the post-conviction relief ("PCR") court erred in determining that Bassett's natural life sentence was mandatory under *Miller v. Alabama*, 567 U.S. 460 (2012) (holding the Eighth Amendment prohibits the imposition of mandatory life-without-parole sentences on juvenile offenders, reversing the sentences of two defendants, and remanding for further proceedings). We must also determine whether the PCR court erred in concluding Bassett was entitled to an evidentiary hearing pursuant to *State v. Valencia*, 241 Ariz. 206 (2016).

¶2   We conclude Bassett's natural life sentence was not mandatory within the meaning of *Miller*, and he was not entitled to an evidentiary hearing. We dismiss Bassett's PCR petition as there has not been a significant change in the law that, if applied to his case, would probably overturn his sentence. *See* Ariz. R. Crim. P. 32.1(g).

## I. BACKGROUND

### A. Bassett's Criminal Conduct

¶3   In 2004, Bassett was riding in the back seat of a car driven by Frances Tapia. Joseph Pedroza, Tapia's boyfriend, was seated in the front passenger seat with Bassett directly behind him. Chad Colyer was sitting next to Bassett in the back seat. As Tapia was driving, Bassett pulled out a shotgun and fatally shot Pedroza in the head. Bassett then turned and fired two shots at Tapia, killing her. The vehicle crashed into a pole. Bassett left the area but subsequently returned to retrieve the shotgun. The next day, officers apprehended Bassett.

### B. Trial And Sentencing Proceedings

¶4   Bassett was convicted on two counts of first degree murder. In its sentencing memorandum, the State argued that the possible sentences

included natural life or life without the possibility of parole for twenty-five years but asked for consecutive natural life sentences. The State explained that the "age of the Defendant of 16.5 at the time of the murder is a mitigating factor" and "this factor requires consideration of the Defendant's 1) level of intelligence, 2) maturity, 3) participation in the murder, and 4) criminal history and past experience with law enforcement," citing *State v. Clabourne*, 194 Ariz. 379, 386 ¶ 28 (1999).

¶5        As to Bassett's age, the State's memorandum asked the trial court to consider that (1) Bassett was extremely intelligent; (2) the State was unaware of anyone describing him as immature or impulsive; (3) he was a full-time student, worked during the summer, and was mature enough to handle his own money; (4) he was "a lady's man" who was sexually active but kept condoms in his room, showing his maturity; (5) he was the sole participant in the murders; (6) he had three juvenile court referrals for violating an injunction, drug possession, and a curfew charge; and (7) his mother was present during his police interview. The State also noted he "had a reputation for carrying a gun and was nicknamed 'Little Scrapper' for fighting."

¶6        Bassett submitted a sentencing memorandum arguing the existence of several mitigating factors, including his (1) dysfunctional family, abandonment by his parents, and kidnapping and abuse by his father; (2) reputation as an ethical, hard worker; (3) attempts at self-improvement while incarcerated; (4) mental health, including a diagnosis of post-traumatic stress disorder ("PTSD"); (5) age of sixteen at the time of the offenses; (6) capacity to conform his conduct to the law; (7) prospects for rehabilitation; and (8) remorse. According to Bassett, just before his second birthday, Bassett's father kidnapped him and his brother. His father was later arrested and charged with two counts of custodial interference. Bassett was raised by another family, the Alexanders, as his mother did not want him but kept custody of her other son.

¶7        As to his age, Bassett's sentencing memorandum claimed it "is common knowledge that 16 year olds do not possess the judgment and impulse control of an adult. This is why they are not allowed to drink, vote or otherwise engage in certain adult activities." Bassett cited *Roper v. Simmons*, 543 U.S. 551 (2005) (holding the Eighth Amendment prohibits

4

imposing the death penalty on juvenile offenders). He then discussed three general differences between juveniles and adults set forth in *Roper*—a lack of maturity and underdeveloped sense of responsibility, greater susceptibility to negative influences and outside pressures, and a character that is not well formed.

¶8 Bassett also noted that he was diagnosed with PTSD in 2002 and was prescribed medications, but he stopped taking those medications in 2003 because of side effects. Bassett claimed his PTSD, hypervigilance, and "exaggerated startle response when confronted with stressful situations . . . may well have led [him] to severely overreact to events on the night of the shootings."

¶9 Tapia's mother submitted a victim's sentencing memorandum, pursuant to A.R.S. § 13-4426 and Arizona Rule of Criminal Procedure 39(c). She argued that when Bassett's age "at the time he killed two people and the parents of three children" is "considered in light of the degree of planning and his callous conduct following the murders, all in an effort to avoid responsibility, it would be an injustice for him to be mature enough to commit the crime but be too immature to face the consequences."

¶10 The trial court held a sentencing hearing. At this hearing, the court explained it had read the presentence report, letters, and sentencing memoranda. The State acknowledged Bassett's age as a mitigating factor, but maintained the following aggravating factors supported imposition of natural life sentences: (1) this was a double homicide; (2) the murder of Tapia was especially cruel because she endured mental and physical anguish as she watched Bassett kill Pedroza and then tried to "ward off the blow" that hit her shoulder before Bassett fired a second time and killed her; (3) use of a deadly weapon; (4) grave risk of death to Colyer; and (5) lack of remorse for Tapia's death, as Bassett told the police, "[o]h well, I thought I missed her" before shooting her a second time and called her "that girl."

¶11 Bassett called Charles Alexander, who helped raise him, to testify on his behalf. Alexander stated that Bassett was a sixteen-year-old kid preyed upon by Pedroza. Bassett's girlfriend also spoke, asserting that he "made a bad decision" and "the biggest thing" the court should consider

"is his age. He was 16 when it happened. He was scared." The presentence report noted that Bassett claimed Pedroza was threatening his life before the murders.

¶12 Bassett's counsel argued he "was a child" at sixteen years old and "juveniles are susceptible to negative influences" and their "characters are not fully formed." He claimed that the United States Supreme Court "took notice of numerous scientific studies that have been done recently that establish that the portions of the brain that control impulsivity and foresight and appreciation of consequences don't really form fully until the early 20's," and quoted directly from *Roper*: "[T]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." 543 U.S. at 570 (quoting *Johnson v. Texas*, 509 U.S. 350, 368 (1993)). He argued that juveniles have "poor impulse control," and this may have been compounded here by Bassett's PTSD, but he "may well have the tools to better himself in the future." Bassett requested sentences that would allow the possibility of parole after twenty-five years.

¶13 The trial court reiterated that it had carefully read and considered all submitted materials and explained its consideration of the following factors:

- The emotional harm to the surviving family member victims, which is "substantial" and "spans several generations";

- The physical cruelty imposed, as Tapia "was conscious after the first wound was inflicted" and she reacted to it, tried to deflect the second shot, screamed, and suffered physical pain before she was killed;

- The serious physical injury;

- The use of a deadly weapon;

- The fact there were two homicides;

- Bassett's juvenile delinquent behavior and record, including adjudications for possession of marijuana and possession of drug paraphernalia and for assault in 2003;

- The grave risk of death to Colyer; and

- The fact Bassett brought extra ammunition into the car as evidence of intent and the danger his conduct presents to the public.

**¶14** The trial court then discussed its consideration of several mitigating factors:

> Your age. You were 16-and-one-half years old at the time of the crimes, and this factor is given considerable weight by the Court. But the weight is tempered because of your intelligence, your obvious intelligence, the fact that you were able to obtain and hold employment and apparently do very well with employment.
>
> I've also considered your contact with the juvenile justice system as a factor in your level of maturity, because in those contacts with the juvenile justice system you were given the opportunity to seek help, to address any issues that were present as a result of any mental health conditions such as the post traumatic stress disorder. And so even though you were young, you were presented with help, and you could have taken advantage of it. It's clear that you didn't.
>
> In terms of the post traumatic stress disorder, that was diagnosed at age 14, and it was manageable with medication, according to the brief records that I was provided. But you stopped taking your medication, as indicated in the last doctor's note that was submitted to the Court.
>
> I've considered your accomplishments in jail. Those are entitled to minimal weight.

7

> And I've considered the support of your family and friends. It's certainly expected, it's understandable, and it is given some weight as well.
>
> And I've considered your statement of remorse, and also note that up until today . . . there was no remorse expressed concerning your killing of [Tapia].

The court explained, "[t]here is no presumptive sentence for first degree murder when the death penalty is not allowed, and in [this] case it is not allowed, so I approach this with an open mind."

¶15 For count one (Tapia's murder), the court determined Bassett's conduct "is evidence of a hardened heart" which is "a personality trait that is extremely dangerous to the public." Based on the evidence presented, the court concluded that "the danger [Bassett] present[s] to the public cannot be addressed with anything less than a natural life sentence." The court sentenced Bassett to a sentence of natural life for count one.

¶16 For count two (Pedroza's murder), the court noted "the circumstances are different . . . because of the facts of the case and what happened in that car that day. Giving full credit to all the aggravating and mitigating factors," the court sentenced Bassett to a consecutive life sentence with the possibility of parole after twenty-five years.

¶17 When Bassett committed the murders, A.R.S. § 13-1105(C) (2002) provided that "first degree murder is . . . punishable by death or life imprisonment as provided by sections 13-703 and 13-703.01." In turn, A.R.S. § 13-703(A) (2003) provided for alternative sentences of (1) natural life, where the defendant "is not eligible for . . . release from confinement on any basis," or (2) life without eligibility for "release[] on any basis until the completion of the service of twenty-five calendar years if the murdered person was fifteen or more years of age."[1] Although the parties and court used the term "parole" at sentencing, Bassett was actually ineligible for parole. In 1993, the Arizona Legislature eliminated parole for all offenses

---

[1] The current version of this statute appears at A.R.S. § 13-751.

committed on or after January 1, 1994. *See* 1993 Ariz. Sess. Laws ch. 255, §§ 86, 88 (1st Reg. Sess.). Accordingly, Bassett's only option would have been "release" after twenty-five years through the executive clemency process. *See* § 13-703(A) (2003); *see also* A.R.S. §§ 31-402, -443.

**¶18** Bassett's convictions and sentences were affirmed on appeal. *State v. Bassett*, 215 Ariz. 600, 604 ¶ 21 (App. 2007). This Court denied review.

### C. Bassett Seeks Post-Conviction Review

**¶19** Bassett previously sought post-conviction review on two occasions. His first PCR was dismissed in 2009. Then, in 2013, Bassett filed a PCR notice asserting that *Miller* was a significant change in the law that entitled him to relief. *See Miller*, 567 U.S. at 489 ("By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes before us violate . . . the Eighth Amendment's ban on cruel and unusual punishment."). The PCR court dismissed the notice, finding it untimely and successive; further, Bassett failed to demonstrate that *Miller* made a significant change in the law as applied to his case, and the record demonstrated that Bassett's age was given considerable weight. Bassett sought rehearing, but the PCR court denied relief. The court of appeals granted review but also denied relief. *State v. Bassett*, No. 2 CA-CR 2016-0151-PR, 2016 WL 3211766, at *1 ¶ 1 (Ariz. App. June 9, 2016) (mem. decision). This Court denied review.

### D. Bassett's Pending PCR Petition

**¶20** In 2017, Bassett filed a PCR petition under Rule 32.1(g), claiming that his natural life sentence violates *Miller* and *Montgomery v. Louisiana*, 577 U.S. 190, 208–09 (2016) (holding "*Miller* announced a substantive rule of constitutional law" and "is retroactive"). Bassett argued that the "*Miller* rule, as expanded by *Montgomery*," instructs "what sentencing courts are supposed to do (consider a juvenile defender's age)" and "how sentencing courts are to consider a juvenile defender's age with respect to the crimes committed: whether there is 'permanent

incorrigibility.'"   Bassett acknowledged that the trial court considered his age but claimed it improperly did not make a finding that his crime reflects irreparable corruption versus transient immaturity.

**¶21**          Initially, the State conceded that Bassett was entitled to an evidentiary hearing under *Valencia*, 241 Ariz. at 210 ¶ 18 (holding petitioners are entitled to evidentiary hearings on their Rule 32.1(g) petitions after making colorable claims for relief based on *Miller*).   But the State later moved to vacate the evidentiary hearing and dismiss the PCR petition, citing *State v. Soto-Fong*, 250 Ariz. 1 (2020), and *Jones v. Mississippi*, 141 S. Ct. 1307 (2021).   The State maintained that *Miller* and *Montgomery* do not constitute a significant change in the law as applied to Bassett's case, and *Jones* implicitly overruled *Valencia*'s interpretation of *Montgomery*.

**¶22**          The PCR court determined that a "colorable claim exists because Bassett was sentenced under a mandatory natural life sentencing scheme that *Miller* and *Jones* found to be unconstitutional."   The "law did not allow the sentencing judge to consider life with the possibility of parole as an alternative to a sentence of natural life."   A colorable claim also exists because the petition "alleges facts that, if proven, establish that the court imposed a [life-without-parole] sentence without giving Bassett's youth and attendant characteristics the weight required by *Miller*."   The PCR court noted Bassett's claim that the court lacked critical information: (1) a psychological evaluation or forensic assessment regarding his risk to reoffend and potential for rehabilitation; (2) input from a mental health expert or forensic social worker or psychiatrist regarding his psychological age and characteristics; (3) cognitive testing results; and (4) a comprehensive mental health evaluation that would provide an individualized assessment of age and its hallmark features.   Even though Bassett's age was considered at sentencing, "an evidentiary hearing [under *Valencia*] is warranted to determine whether that consideration was constitutionally sufficient."   The State filed a motion for reconsideration, which the trial court denied without explanation.

**¶23**          The State filed a petition for special action, but the court of appeals declined jurisdiction.   We granted review because this case presents recurring issues of statewide importance.   We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II.   DISCUSSION

**¶24**         Whether a juvenile's natural life sentence is mandatory under *Miller*, in violation of the Eighth Amendment, is a question of constitutional and statutory interpretation that we review de novo.   *See Soto-Fong*, 250 Ariz. at 4 ¶ 6; *State v. Jurden*, 239 Ariz. 526, 528 ¶ 7 (2016).   We review a trial court's decision to conduct an evidentiary hearing for an abuse of discretion.   *See State v. Acuna Valenzuela*, 245 Ariz. 197, 214 ¶ 52 (2018).

### A.   Preclusion Under Rule Of Criminal Procedure 32.2(a)

**¶25**         The State argues that Bassett's claim was "finally adjudicated on the merits" during a previous PCR proceeding and is therefore precluded under Arizona Rule of Criminal Procedure 32.2(a)(2).   But the State did not raise this issue in its motion to vacate the evidentiary hearing and dismiss the PCR petition; instead, the State raised preclusion for the first time in a motion for reconsideration.   We note that the issues presented under *Miller* and *Valencia* have been raised in several other cases, and there is a substantial need to resolve these recurring issues of statewide importance.   Therefore, under these unique circumstances, we decline to address the threshold issues of whether the State properly raised preclusion and whether Bassett's claim is precluded under Rule 32.2.

### B.   The Eighth Amendment And Juvenile Sentencing

**¶26**         We begin with an overview of applicable case law addressing the Eighth Amendment and juvenile sentencing.   *See Jones*, 141 S. Ct. at 1314.   The Eighth Amendment provides that "cruel and unusual punishments" shall not be "inflicted."   U.S. Const. amend. VIII.   This clause is made applicable to the states through the Fourteenth Amendment. U.S. Const. amend. XIV; *see also Jones*, 141 S. Ct. at 1314.

**¶27**         In 2012, the Supreme Court in *Miller* held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders . . . . By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment."   567 U.S. at 479 (internal citation omitted).   *Miller* did not

impose a categorical ban on parole-ineligible life sentences for juvenile offenders; instead, it mandated "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty."[2]   *Id.* at 483; *see also Soto-Fong*, 250 Ariz. at 7 ¶¶ 22–23.

**¶28**         Then, in *Montgomery*, the Supreme Court held that "*Miller* announced a substantive rule that is retroactive in cases on collateral review."   577 U.S. at 206.

**¶29**         In *Valencia*, petitioners sought post-conviction relief in state court, claiming that their natural life sentences for homicides committed as juveniles were unconstitutional.   241 Ariz. at 207–08 ¶¶ 1–4.   This Court concluded that petitioners were entitled to evidentiary hearings, noting *Montgomery*'s statement that "sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption,'" as distinct from those "whose crimes reflect the transient immaturity of youth," 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 479–80).   *Valencia*, 241 Ariz. at 209–10 ¶¶ 12–18 (citing Ariz. R. Crim. P. 32.1(g)). "At these hearings, they will have an opportunity to establish . . . that their crimes did not reflect irreparable corruption but instead transient immaturity."   *Valencia*, 241 Ariz. at 210 ¶ 18.   The conclusion in *Valencia* was "compelled by the United States Supreme Court's decisions in *Miller* and *Montgomery*."   *Id.* at 210 ¶ 21 (Bolick, J., concurring).

**¶30**         Later, in *Soto-Fong*, this Court rejected claims that consecutive sentences imposed for separate crimes violated the Eighth Amendment because the cumulative sentences exceeded a juvenile's life expectancy. 250 Ariz. at 3 ¶ 1.   We observed that "*Montgomery* muddied the Eighth Amendment jurisprudential waters with its construction of *Miller*," and

---

[2] Before *Miller*, the Supreme Court held in *Roper* that the death penalty was unconstitutional for juvenile offenders.   543 U.S. at 578.   And in *Graham v. Florida*, the Court held that the imposition of life-without-parole sentences on juvenile offenders who did not commit homicide was unconstitutional. 560 U.S. 48, 82 (2010).   Those circumstances are not before us today.

"[t]he Supreme Court's Eighth Amendment jurisprudence concerning parole-ineligible life sentences for juveniles has left the nation's courts in a wake of confusion. State courts and federal circuits have reached disparate resolutions of these cases." *Id.* at 7 ¶¶ 21, 24 (citing *Montgomery*, 577 U.S. at 224 (Scalia, J., dissenting)). In *Soto-Fong*, this Court denied petitioners' requested relief, noting that "*Miller*'s holding was narrow—a trial court must consider certain factors before sentencing a juvenile to life without the possibility of parole," and those factors are "an offender's youth and attendant characteristics." *Id.* at 7 ¶¶ 22–23, 12 ¶ 49.

**¶31** Thereafter, "[i]n light of disagreement in state and federal courts about how to interpret *Miller* and *Montgomery*," the Supreme Court granted certiorari in *Jones*. 141 S. Ct. at 1313. *Jones* involved a juvenile offender convicted of murder. *Id.* at 1312. Under Mississippi law at the time, murder carried a statutory mandatory sentence of life without parole. *Id.* At resentencing, the trial court acknowledged it had discretion under *Miller* to impose a sentence less than life without parole because Jones was a juvenile, but ultimately sentenced him to life without parole. *Id.* at 1313.

**¶32** Jones appealed, arguing that a court's discretion to impose a sentence less than life without parole does not alone satisfy *Miller*; instead, the court must also make a separate factual finding of permanent incorrigibility or provide an on-the-record sentencing explanation with an implicit finding of permanent incorrigibility. *Id.* at 1311–13. The Supreme Court disagreed, holding that *Miller* does not require "a separate factual finding of permanent incorrigibility," nor is an "on-the-record sentencing explanation with an implicit finding of permanent incorrigibility" required. *Id.* at 1314–15, 1318–21. *Miller* "mandated 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Id.* at 1311 (quoting *Miller*, 567 U.S. at 483). And *Montgomery* "flatly stated that '*Miller* did not impose a formal factfinding requirement' and added that 'a finding of fact regarding a child's incorrigibility . . . is not required.'" *Id.* (quoting *Montgomery*, 577 U.S. at 211).

**¶33** *Jones* "carefully follows both *Miller* and *Montgomery*." *Id.* at 1321. "*Miller* held that a State may not impose a mandatory life-without-parole sentence on a murderer under 18," and *Jones* "does not

disturb that holding." *Id. Montgomery* "held that *Miller* applies retroactively on collateral review," and *Jones* "likewise does not disturb that holding." *Id.* The Court's "precedents require a discretionary sentencing procedure" and Jones's resentencing "complied with those precedents because the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth." *Id.* at 1322.

### C. Whether Bassett's Sentence Was Mandatory Under *Miller*

¶34 The PCR court determined that "[a] colorable claim exists because Bassett was sentenced under a mandatory natural life sentencing scheme that *Miller* and *Jones* found to be unconstitutional," as the law did not allow life with the possibility of parole as an alternative to natural life. But *Miller* and its progeny do not specifically require the availability of parole when sentencing a juvenile offender. *See Jones*, 141 S. Ct. at 1312 ("*Miller* held that the Cruel and Unusual Punishments Clause of the Eighth Amendment prohibits *mandatory* life-without-parole sentences for murderers under 18, but the Court allowed *discretionary* life-without-parole sentences for those offenders."). *Jones* reiterated that *Miller* allowed a life-without-parole sentence "so long as the sentence is not mandatory — that is, only so long as the sentencer has discretion to 'consider the mitigating qualities of youth' and impose a lesser punishment." *Id.* at 1314 (quoting *Miller*, 567 U.S. at 476). As *Jones* clarified, "[t]he key assumption of both *Miller* and *Montgomery* was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Id.* at 1318. Such a "discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at 1313.

¶35 As pertinent here, the trial court was required to consider Bassett's age and the qualities of youth as mitigating factors in sentencing. *See* A.R.S. § 13-702(D) (2003) ("For the purpose of determining the sentence pursuant to section 13-710 and subsection A of this section, the court shall consider the following mitigating circumstances: 1. The age of the defendant . . . ."); A.R.S. § 13-703.01(Q)(2) (2003) ("In determining whether to impose a sentence of life or natural life [for first degree murder], the court . . . [s]hall consider the aggravating and mitigating circumstances listed in

§ 13-702 . . . ."); *see also* § 13-703(G)(5) (2003). Under Arizona law "courts must consider not only a juvenile's age but also the 'level of maturity, judgment and involvement in the crime.'" *Valencia*, 241 Ariz. at 210–11 ¶ 23 (Bolick, J., concurring) (quoting *State v. Greenway*, 170 Ariz. 155, 170 (1991)); *see also Clabourne*, 194 Ariz. at 386 ¶ 28 ("In addition to chronological age, this circumstance requires that we consider a defendant's: (1) level of intelligence, (2) maturity, (3) participation in the murder, and (4) criminal history and past experience with law enforcement."). "*Miller* repeatedly described youth as a sentencing factor akin to a mitigating circumstance." *Jones*, 141 S. Ct. at 1315. Under Arizona law, it actually is statutory mitigation. *See* A.R.S. § 13-701(E)(1).

¶36 Arizona's sentencing scheme stands in stark contrast with the state statutes at issue in *Miller*, which mandated that a person convicted of "capital murder . . . shall be sentenced to death or life imprisonment without parole" (Arkansas) and required a "mandatory minimum punishment of life without parole" (Alabama). 567 U.S. at 466, 469 (citations omitted). Both statutory schemes provided *only* the option of life without parole for juveniles. *Id.* at 469. Thus, those trial courts were automatically precluded from considering whether youth and its attendant characteristics might justify a lesser sentence.

¶37 Recently, in *Jessup v. Shinn*, a petitioner claimed that his natural life sentence violated *Miller* because Arizona had abolished parole and the sentencing options available for him (natural life and life with the possibility of release) "would result, as a practical matter, in a sentence of life without parole." 31 F.4th 1262, 1267 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1755 (2023). The court disagreed, concluding that Jessup was not entitled to relief because the sentencing judge considered his "age and other relevant considerations" before concluding that he "did not warrant *any* form of release." *Id.*; *see also id.* ("*Miller* addressed situations in which the sentencing authority imposed a sentence of life without parole *automatically*, with no individualized sentencing considerations whatsoever."). In *Jessup*, "[n]othing in the record suggests that the precise form of potential release at issue had any effect on the sentencing judge's exercise of discretion. Much to the contrary, the record makes clear that the sentencing judge (and everyone else involved) genuinely, if mistakenly,

thought that he was considering a sentence of life with the possibility of *parole*." *Id.* The same is true here.

**¶38** *Miller* referred to "29 jurisdictions mandating life without parole for children" and cited in a footnote multiple states' laws, including A.R.S. § 13-752 (2010) and A.R.S. § 41-1604.09(I) (2011). 567 U.S. at 486 & n.13. As an initial matter, we note that "Arizona currently requires (and did so when these sentences were issued) trial courts to consider age as a mitigating factor in determining punishment for first-degree murder." *See Valencia*, 241 Ariz. at 210 ¶ 23 (Bolick, J., concurring) (citing § 13-701(E)(1)); *see also* § 13-702(D) (2003), § 13-703.01(Q)(2) (2003). *Miller*, however, did not consider this statutory discretion in sentencing. Nonetheless, even if an issue remained with Arizona's sentencing scheme, the "Arizona legislature has now remedied that circumstance." *State v. Vera*, 235 Ariz. 571, 578 ¶ 27 (App. 2014). With the passage of A.R.S. § 13-716 in 2014, juvenile offenders sentenced to life with the possibility of release after serving a minimum number of years are eligible for parole once the offender completes service of the minimum sentence, regardless of whether the offense was committed on or after January 1, 1994. Here, the trial court chose between two sentencing options and determined that natural life was appropriate for count one. Regardless of whether parole was available at that time, Bassett would now be eligible for parole had the court imposed the lesser sentence for count one. *See Jessup*, 31 F.4th at 1268 ("Arizona's more recent statutory changes and caselaw make it nearly certain that, had the sentencing judge allowed release or parole after 25 years, Petitioner would, in fact, be eligible for parole.") (citing § 13-716; *Vera,* 235 Ariz. at 573–78).

**¶39** In accordance with *Miller*, its progeny, and Arizona's sentencing law, Bassett's chronological age and attendant characteristics were considered during a discretionary sentencing process at which, as in *Jessup*, 31 F.4th at 1263–64, the trial court decided whether to impose a natural life sentence or a lesser punishment. The court was not required to sentence Bassett to natural life, as evidenced by its decision to sentence him to "life with the possibility of parole after 25 years" for the murder underlying count two. The trial court deliberately made a *choice* between two sentencing options based upon the requisite factors, noting there was

"no presumptive sentence" and that it would "approach this with an open mind." Bassett's natural life sentence was not mandatory under *Miller*.[3]

## D. Entitlement To Evidentiary Hearing Under *Valencia*

**¶40** The PCR court determined that, although the trial court considered Bassett's age during sentencing, he was entitled to an evidentiary hearing under *Valencia* to determine "whether that consideration was constitutionally sufficient." We conclude that Bassett is not entitled to an evidentiary hearing.

**¶41** In *Valencia*, this Court relied on *Montgomery*'s view of *Miller* that "sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption" in holding that petitioners were entitled to evidentiary hearings. 241 Ariz. at 207 ¶ 1, 209 ¶ 14 (internal quotation marks omitted) (quoting *Montgomery*, 577 U.S. at 208). *Valencia* explained that the evidentiary hearings will give petitioners "an opportunity to establish . . . that their crimes did not reflect irreparable corruption but instead transient immaturity." *Id.* at 210 ¶ 18.

**¶42** The evidentiary hearings required in *Valencia*, however, were based on a pre-*Jones* reading of *Miller* and *Montgomery*. *Jones* refuted the premise for *Valencia*'s mandate for an evidentiary hearing to address whether a crime reflected "irreparable corruption" versus "transient immaturity." *Jones* clarified that courts are only required to consider a juvenile offender's "youth and attendant characteristics" before imposing a life-without-parole sentence. 141 S. Ct. at 1314–16. That occurred here. Further, *Miller* and *Montgomery* imposed no requirement for a court to make

---

[3] Our decision today does not foreclose resentencing under circumstances where a juvenile offender demonstrates the trial court did not "follow a certain process—considering an offender's youth and attendant characteristics," or if a trial court rules it lacks "discretion to 'consider the mitigating qualities of youth' and impose a lesser punishment" because a natural life sentence is mandatory. *Jones*, 141 S. Ct. at 1314 (quoting *Miller*, 567 U.S. at 476, 483). This, however, was not the case with Bassett's sentencing.

a separate factual finding of "permanent incorrigibility" or provide an "on-the-record sentencing explanation with an implicit finding of permanent incorrigibility." *Id.* at 1318, 1321.

**¶43** Amicus Maricopa County Public Defender argues that a juvenile life-without-parole sentence that is the product of "transient immaturity" is unconstitutional under *Miller*, and the Supreme Court reaffirmed this "substantive component" of *Miller* in *Jones,* 141 S. Ct. at 1315 n.2. According to amicus, even if a sentencing scheme satisfied *Miller*'s procedural requirements, a juvenile life-without-parole sentence is still unconstitutional if the underlying crime reflected "transient immaturity"; therefore, there is still a need for *Valencia*'s evidentiary hearings. We disagree. A review of *Miller* and its progeny demonstrates that "transient immaturity" is not a substantive component of *Miller*.

**¶44** *Miller* made clear its holding: "We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at 479. *Miller*'s concluding paragraph explained that the Eighth Amendment guaranteed discretionary sentencing, which Alabama and Arkansas did not have:

> *Graham*, *Roper,* and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment.

*Id.* at 489. *Miller* mentions "transient immaturity" only one time when observing, "we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon" and that "is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime

reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" *Id.* at 479–80 (quoting *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 68). *Miller*'s speculation about what may happen in the future is dictum and does not create a "substantive component" of a constitutional right. *See Soto-Fong*, 250 Ariz. at 9 ¶ 32 ("This Court, of course, is bound to follow applicable holdings of United States Supreme Court decisions, but not mere dicta or other statements that allegedly bear on issues neither presented nor decided in such decisions."); *Barrows v. Garvey*, 67 Ariz. 202, 206 (1948) ("Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of an adjudication." (quoting *Obiter Dicta*, Black's Law Dictionary (3d ed. 1933))).

¶45        *Montgomery* then held that "*Miller* announced a substantive rule of constitutional law" which must be given "retroactive effect." 577 U.S. at 212. But as *Jones* made clear, "*Montgomery* did not purport to add to *Miller*'s requirements." 141 S. Ct. at 1316; *see also id.* at 1317 ("Despite the procedural function of *Miller*'s rule, *Montgomery* held that the *Miller* rule was substantive for retroactivity purposes and therefore applied retroactively on collateral review."). This clarification set forth in *Jones*—that *Montgomery* did not expand *Miller*—is not altered by the fact that *Jones* reviewed a resentencing procedure, and we review a PCR proceeding here.

¶46        Amicus focuses on footnote 2 of *Jones* that quotes an entire paragraph from *Montgomery*. The end of this paragraph in *Montgomery* states: "That *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." 141 S. Ct. at 1314-15 & n.2 (quoting *Montgomery*, 577 U.S. at 211). Footnote 2 in *Jones* quoted *Montgomery* in the context of (1) explaining that *Miller* and *Montgomery* "squarely rejected" a formal factfinding requirement, and (2) declining Jones's request for a mandatory separate factual finding of permanent incorrigibility. *Id.* Footnote 2 did not embed "transient immaturity" as a "substantive component" of *Miller*.

¶47          For these reasons, we overrule *Valencia* because *Jones* abrogated the premise of *Valencia*'s holding that juvenile offenders are entitled to evidentiary hearings where they will have "an opportunity to establish . . . that their crimes did not reflect irreparable corruption but instead transient immaturity" when a court has imposed a natural life sentence "without distinguishing crimes that reflected 'irreparable corruption' rather than the 'transient immaturity of youth.'"    *Valencia*, 241 Ariz. at 209–10 ¶¶ 15–18.    Thus, Bassett is not entitled to a *Valencia* hearing.

### E.    Bassett's Requested Relief Under Rule 32.1(g)

¶48          The record before us demonstrates that Bassett's sentencing satisfied *Miller* and its progeny.    During sentencing, Bassett addressed *Roper* in the context of his mitigation, discussed the differences between juveniles and adults set forth in *Roper*, stated that he "was a child at 16 years old," and argued that "juveniles are susceptible to negative influences," have "poor impulse control," and lack fully formed characters.    The trial court considered his age to be a mitigating factor as required by statute and gave "considerable weight" to the fact he was "16-and-one-half years old at the time of the crimes."    The court also considered Bassett's attendant circumstances, including his upbringing, family life, PTSD diagnosis at age fourteen, and opportunities to seek help and address issues as a juvenile.

¶49          But the court found that the weight of his age was tempered because of his intelligence and ability to obtain and hold employment.    In addition, the court observed that Bassett failed to take advantage of help provided to him through the juvenile justice system and failed to address his mental health conditions by stopping his medication.    Further, the court noted that Bassett's conduct was "evidence of a hardened heart" which is "a personality trait that is extremely dangerous to the public" and "the danger [Bassett] present[s] to the public cannot be addressed with anything less than a natural life sentence"—an implicit finding of irreparable corruption.    Thus, the court considered Bassett's youth and

attendant characteristics before making the discretionary decision to sentence him to natural life on count one.[4]

**¶50**		Bassett claims his sentence does not meet constitutional scrutiny because he "was not afforded the opportunity to have his youth meaningfully" or "adequately considered" at sentencing. He argues that the trial court was presented with "generalized statements about youth," instead of "essential evidence as to the age and specific attendant characteristics," including a psychological evaluation and assessment of his "actual psychological age." But *Miller* and its progeny do not mandate that a particular weight—or meaningful or adequate consideration—be given to a juvenile's youth and attendant characteristics. Nor do those cases prescribe what particular information (or how much) must be presented during the sentencing of a juvenile offender. *Jones* made clear that *Miller* does not require formal or specific "factual finding[s]," "on-the-record sentencing explanation[s]," or use of certain language. *Jones*, 141 S. Ct. at 1316, 1319–21. Where a court has "'consider[ed] an offender's youth and attendant characteristics[] before imposing' a life-without-parole sentence," it has complied with *Miller* and its progeny. *See id.* at 1311, 1314, 1316 (quoting *Miller*, 567 U.S. at 483). Bassett points to language in *Jessup* noting that the sentencing judge there received certain types of information, engaged in "extensive deliberation," and "thoughtfully considered" a sentence of life with the possibility of release. But *Jessup* did not hold these are constitutionally mandated elements under *Miller*. 31 F.4th at 1266.

**¶51**		*Jones* made clear that its holding "does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder." 141 S. Ct. at 1323. States could "categorically prohibit life without parole for all offenders under 18," "require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole," or require an on-the-record

---

[4] For these reasons, the constitutional provision that "[j]uveniles 15 years of age or older accused of murder . . . shall be prosecuted as adults," Ariz. Const. art. 4, pt. 2, § 22(1), did not transform Bassett's sentencing into one that failed to comply with *Miller*.

explanation of "why a life-without-parole sentence is appropriate notwithstanding the defendant's youth." *Id.* But, significantly, the Arizona Legislature has not taken such action. *See State v. Holle*, 240 Ariz. 300, 302 (2016) ("The legislature is empowered to define what constitutes a crime in this state and to prescribe the punishment for criminal offenses."). Moreover, no party has argued that any Arizona constitutional or statutory provision mandates these additional sentencing requirements.

**¶52** In contrast to the juvenile offenders sentenced under the mandatory sentencing schemes in *Miller*, 567 U.S. at 465–69, 489, Bassett received an individualized sentencing hearing at which, after considering his youth and its attendant circumstances, the trial court found him unsuitable for any form of release on count one. That the trial court made an affirmative choice between types of sentences for Bassett's murder convictions is further evidenced by the fact that the court reached a different conclusion as to count two. Bassett was sentenced in accordance with the requirements in *Miller* and its progeny.

### III. CONCLUSION

**¶53** Because there has not been a significant change in the law that, if applied to Bassett's case, would probably overturn his sentence, we reverse the trial court's order finding that Bassett presented a colorable claim for relief under Rule 32.1(g). We vacate the trial court's ruling granting a *Valencia* evidentiary hearing and dismiss Bassett's PCR petition. *See* A.R.S. § 13-4236(C) (stating "the court shall order the petition dismissed" where "no material issue of fact or law exists which would entitle the defendant to relief").